UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                              :

DANIEL McGOWAN,                  :
                              :

               Plaintiff,     :     **MEMORANDUM**
                              :     **<u>DECISION AND ORDER</u>**
     -against-            :
                              :     14 Civ. 4945 (BMC)
                              :

UNITED STATES OF AMERICA; TRACY    :
RIVERS, Residential Reentry Manager;    :
COMMUNITY FIRST SERVICES, INC.; and   :
CORE SERVICE GROUP, INC.,         :
                              :
             Defendants.    :
                              :
-------------------------------------------------------- X

**COGAN**, District Judge.

      This case raises some novel issues concerning the availability of remedies for the alleged violation of a prisoner's right to freedom of speech under the First Amendment and corresponding remedies under the common law.  Plaintiff's fundamental problem is that he approaches the case as if he were an ordinary citizen.  He is not.  Whether in a federal prison or a halfway house, he was at all relevant times a convicted felon in the custody of the United States, and any rights of redress have to be viewed from that perspective.   I hold that on the facts of this case, there is no right of action against the Government or its employees.

## BACKGROUND

      The amended complaint alleges that as he was nearing the end of his 84-month federal prison sentence, plaintiff was assigned to a halfway house to serve out the remainder.  He enjoyed certain privileges as a halfway house inmate that prisoners do not enjoy in most other BOP facilities.  He was given a work pass, and obtained full time employment as a receptionist.

He was allowed home visits on weekends, and had the ability to apply for passes to attend social events.

After about four months in the halfway house, on April 1, 2013, plaintiff, under his byline, published an article on an internet news site entitled *Court Documents Prove I Was Sent to a Communications Management Unit (CMU) For My Political Speech*. The article described how plaintiff had been reassigned to a Communications Management Unit, where he was restricted in his contacts with visitors, in retaliation for his engaging in protected speech. The subject of that article is not the retaliation at issue in the instant case – it is the BOP's response to the article itself.

The article came to the attention of Bryan Acosta, a BOP Information Technologies employee, who prepared an "incident report" on April 3, 2013. The incident report recited the fact of the published article under plaintiff's byline, and stated: "The BOP Program Statement no. 1480.05 dated September 21, 2000; 540.62 page 5, section (d) stipulates that an inmate currently confined in an institution may not be employed or act as a reporter or publish under a byline." The reference was to former 28 C.F.R. § 540.62(d). (I refer to this below as the "byline prohibition.")

That is indeed what the regulation said, but not at the time of the incident report. A "Final Rule" published in the Federal Register by the BOP on April 3, 2012, and annexed to the amended complaint, discusses some of the history of the byline prohibition and its ultimate demise. This Final Rule explains that the byline prohibition in the Program Statement was eliminated by Interim Rule in April, 2010, in response to the decision in Jones v. Pugh, 504 F. Supp. 2d 1109 (D. Colo. 2007). The court in Jones held that the blanket regulatory prohibition against an inmate's use of his byline, without a case by case assessment of whether the use posed

a threat to prison security, violated inmates' First Amendment right to freedom of speech because it did not serve a "legitimate penological objective." Id. at 1123. The court entered an injunction prohibiting the BOP from enforcing the byline prohibition.[1] The comment to the Final Rule also noted that on November 27, 2007, prior to the Interim Rule in 2010, it had issued "mandatory guidance" to its staff that it was revising the rule, and that pending that revision, "an inmate publishing under a byline, by itself, can no longer support disciplinary action" under the regulation.

Defendant Tracy Rivers was the residential entry manager for the halfway house and an employee of the BOP. The halfway house itself was run by a private company, defendant Community First Services, Inc. ("CFS"), under contract with the BOP. Upon learning of plaintiff's publication, defendant Rivers directed Grace Terry, who is employed by CFS as Facility Manager of the halfway house, to issue the incident report concerning the article to plaintiff, which Terry did on April 4, 2014.

Rivers decided that as a result of publishing the article, plaintiff should be remanded from the halfway house to a federal detention center. On the morning of that same day, U.S. Marshals transported him to the Special Housing Unit of the Metropolitan Detention Center. Plaintiff lost his work pass as a result.

Upon a complaint from plaintiff's attorneys, Rivers' superior advised her that the byline prohibition had been repealed. Rivers then expunged the incident report and arranged for plaintiff's return to the halfway house in the early evening of April 5, 2014.

---

[1] Jones actually concerned a substantively identical counterpart of the byline prohibition, former 28 C.F.R. 540.20(b).

Once returned, plaintiff was given a written warning by his case manager, a CFS employee named Massiel Suriel, not to have any contact with the media without prior approval from Rivers. That warning was rescinded at Rivers' direction because it applied too broadly another BOP regulation prohibiting media representatives from interviewing inmates at a BOP institution – the regulation did not prohibit all contacts between an inmate and a reporter.

The amended complaint further alleges that as a result of Rivers' retaliatory remand, plaintiff suffered damages including embarrassment, loss of enjoyment of life, and lost liberty. It contains four claims for relief: (1) against the United States under the Federal Tort Claims Act, for false arrest and false imprisonment for "violat[ing] his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York"; (2) against the United States, under the FTCA, and CFS, for negligence resulting from the actions of Terry and Suriel under the doctrine of *respondeat superior*; (3) against CFS, for negligent hiring and supervision of Terry and Suriel; and (4) against Rivers, under <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), for violating plaintiff's right to free speech.

Both the United States and Rivers, on the one hand, and CFS, on the other, have moved to dismiss the amended complaint.

## DISCUSSION

## I

There may be situations where it would be appropriate to extend <u>Bivens</u> to encompass First Amendment violations. But it may not ever be appropriate to do so in the area of federal prisoners' rights, and it is certainly not appropriate to do so in the context of the facts alleged here. The Supreme Court has viewed the judicial damage remedy in <u>Bivens</u> itself as

"extraordinary," one that should rarely be applied in "new contexts." See Arar v. Ashcroft, 585 F.3d 559 (2d Cir. 2009) (en banc) (quoting Correctional Services Corp. v. Malesko, 534 U.S. 61, 69, 122 S.Ct. 515 (2001), and citing Schweiker v. Chilicky, 487 U.S. 412, 421, 108 S.Ct. 2460 (1988)). As the Second Circuit further noted in Arar, the Supreme Court has allowed a Bivens remedy, beyond the facts of Bivens itself, only to deter violations of the cruel and unusual punishment prohibition of the Eighth Amendment, see Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468 (1980), and to protect federal employees from employment discrimination pursuant to the Due Process Clause of the Fifth Amendment. See Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264 (1979).

Notably, although Carlson and Davis were handed down within a decade of Bivens, they mark the beginning of a still-unbroken period of more than 30 years since the Supreme Court authorized a Bivens damage action covering the exercise of any other constitutional right. This supports the observation of the majority in Malesko that since Bivens, "we have retreated from our previous willingness to imply a cause of action where Congress has not provided one," 534 U.S. at 67 n.3, 122 S.Ct. at 519 n.3, and the even stronger observation of two Justices that

> Bivens is a relic of the heady days in which this Court assumed common-law powers to create causes of action – decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition. … [W]e have abandoned that power to invent "implications" in the statutory field. There is even greater reason to abandon it in the constitutional field, since an "implication" imagined in the Constitution can presumably not even be repudiated by Congress.

Malesko, 534 U.S. at 75, 122 S.Ct. at 524 (Scalia, J., concurring) (citation omitted). It is impossible not to observe that although the Court has found a variety of reasons to decline the

extension of <u>Bivens</u> into a number of different scenarios, it has not found a single scenario to authorize that extension since 1980.[2]

Two of the scenarios into which the Supreme Court has refused to extend <u>Bivens</u> are at least informative if not somewhat analogous to the present case. In <u>Bush v. Lucas</u>, 462 U.S. 367, 103 S.Ct. 2404 (1983), the Court refused to extend First Amendment protection through <u>Bivens</u> to federal employees who had been subjected to retaliation for exercising their First Amendment rights. There, the plaintiff had made public statements critical of his employer, NASA, which demoted him as a result of his statements. Although he prevailed in his administrative challenge on First Amendment grounds, including reinstatement and back pay, he sought consequential damages in court under <u>Bivens</u>. Based, in part, on the comprehensive administrative scheme for redressing these grievances, the Supreme Court refused to imply a damage remedy:

> The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff. The policy judgment should be informed by a thorough understanding of the existing regulatory structure and the respective costs and benefits that would result from the addition of another remedy for violations of employees' First Amendment rights.

<u>Id.</u> at 388, 103 S.Ct. at 2416-17.

<u>Wilkie v. Robbins</u>, 551 U.S. 537, 127 S.Ct. 2588 (2007), also involved a claim of retaliation. In <u>Wilkie</u>, the federal Bureau of Land Affairs had allowed an easement over the

---

[2] Plaintiff relies on three cases where the Supreme Court assumed *arguendo* the existence of a <u>Bivens</u> claim and then proceeded to direct the dismissal of the case on separate grounds. Those cases are no authority at all for implying a <u>Bivens</u> action here. "Constitutional rights are not defined by inferences from opinions which did not address the question at issue." <u>Texas v. Cobb</u>, 532 U.S. 162, 169, 121 S.Ct. 1335 (2001). <u>See</u> also <u>In re Stegall</u>, 865 F.2d 140, 142 (7th Cir. 1989) ("A point of law merely assumed in an opinion, not discussed, is not authoritative."); <u>cf.</u> <u>Getty Petroleum Corp. v. Bartco Petroleum Corp.</u>, 858 F.2d 103, 113 (2d Cir. 1988) ("a *sub silentio* holding is not binding precedent) (internal quotation marks omitted).

plaintiff's land to lapse. When negotiations failed to restore it on terms acceptable to the Bureau, Bureau employees repeatedly and illegal trespassed on his land, including breaking into his home, and caused fines and civil administrative and criminal charges to be brought against the plaintiff in retaliation for his refusal to grant the easement. He sought to bring a <u>Bivens</u> claim for deprivation of his Fourth and Fifth Amendment rights. Focusing initially on whether there existed any other avenues of redress, the Court held that the plaintiff "has an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints," <u>id.</u> at 553, 127 S.Ct. at 2600, which did not weigh in favor of recognizing a <u>Bivens</u> claim. It then concluded that creating a <u>Bivens</u> claim would "raise[] a serious difficulty of devising a workable cause of action," <u>id.</u> at 562, 127 S.Ct. at 2603, and declined to do so.

     <u>Wilkie</u> distilled the issue of whether to imply a <u>Bivens</u> action into two steps:

> In the first place, there is the question whether any alternative, existing process for protecting the [constitutionally recognized] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.... But even in the absence of an alternative, a <u>Bivens</u> remedy is a subject of judgment: "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation."

551 U.S. at 550, 127 S.Ct. at 2598 (quoting <u>Bush v. Lucas</u>, 462 U.S. 367, 378, 103 S.Ct. 2404 (1983)). The Court has continued to apply that framework. <u>See</u> <u>Minneci v. Pollard</u>, 132 S.Ct. 617, 621-22 (2012).

     In the instant case, the <u>Wilkie</u> analysis comes out against extending <u>Bivens</u> to the allegations in plaintiff's complaint. First, there are administrative and judicial alternatives for vindicating plaintiff's rights. Plaintiff could have asserted that his remand from the halfway house to the SHU at MDC was in violation of First Amendment rights through a petition for a writ of habeas corpus under 28 U.S.C. § 2241. <u>See</u> <u>Carmona v. U.S. Bureau of Prisons</u>, 243 F.3d

629, 632 (2d Cir. 2001). Of course, that right is generally conditioned on the exhaustion of the multi-step administrative remediation process administered by the BOP, see id. at 634; 28 C.F.R. §§ 542.10-542.19, but this merely confirms that the administrative remedy can be effective in relieving a prisoner from unconstitutional conditions of confinement. Indeed, the speed with which plaintiff's reassignment to the MDC was rescinded when his lawyers called the revision of the regulation to the attention of the BOP suggests that the administrative remedy would have worked and perhaps did work well here – although the amended complaint does not describe in detail the steps plaintiff undertook in this regard (not that there is any reason it had to), it seems not that far removed from the "informal resolution" process that the regulations themselves require as an initial step.

Plaintiff may complain that these remedies do not result in money damages to him, and that is true, but a monetary recovery has not been a factor at all in the more recent Bivens jurisprudence. The emphasis, rather, is on the existence of an avenue to protect the right, not the method of protection that Congress or the Executive has chosen. Besides, the extent to which Bivens remains available, if viable as a practical matter at all in light of its nearly unvarying contextual rejection by the courts, does not depend on the early judicial predisposition that is apparent in the caselaw – that the judiciary, rather than other branches of government, is better able to determine when damages as opposed other enforcement mechanisms are more effective at inducing the observance of constitutional rights. In Wilkie, the Supreme Court refused to imply a Bivens remedy to redress what it referred to as "death by a thousand cuts," 551 U.S. at 555, 127 S.Ct. at 2600; all the less reason to imply a remedy to redress a single, relatively shallow, cut.

Even assuming the absence of adequate non-<u>Bivens</u> remedies, however, I would need to proceed to the second step of the <u>Wilkie/Bivens</u> framework – the consideration of whether there are any "special factors counseling hesitation before authorizing a new kind of federal litigation." 551 U.S. at 550, 127 S.Ct. at 2598 (quotation omitted). I think that there are. This is not an employment relationship like <u>Davis</u>, or even the application of whether a prison custodian's conduct "shocks the conscience" under the Eighth Amendment as in <u>Carlson</u>. Rather, plaintiff is asking the courts to intermeddle in the delicate area of balancing what would be the First Amendment right to expression against the crucial security concerns inherent in a custodial setting.

In other words, this case is not about First Amendment rights; it is about that narrower subset of First Amendment rights that is not surrendered when a convicted criminal is placed into custody. See <u>Pell v. Procunier</u>, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) (noting "the familiar proposition that lawful incarceration brings about the necessary withdrawal or limitation of many privileges as rights," and that "a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner with the legitimate penological objectives of the corrections system") (citations and quotation marks omitted). Unlike an employment relationship as in <u>Davis</u>, when a judicial error can cost someone a job or saddle an employer with an obligation towards a poorly performing or disruptive employee, a judicial error here can get inmates hurt or worse. The gravity of the endeavor cannot deter courts from zealously protecting constitutional rights, but it suggests caution when an inmate has been subjected to a brief period of more restrictive custody due to

either a mistaken view of prison regulations, as plaintiff alleges in his FTCA negligence claim, or, at worst, an effort to punish an inmate for embarrassing the BOP.[3]

Indeed, plaintiff's description of his claim as "retaliation" for exercising his First Amendment rights is somewhat of a misnomer in the prisoners' rights context. Prison officials impose discipline when they believe rules or regulations have been violated. In that sense, most prison discipline is in "retaliation" for something an inmate has or has not done. There is no doubt an abundance of prohibited speech in which an inmate might legitimately engage if he were not an inmate but which prison authorities could readily punish without contravening the First Amendment; the punishment in that instance is "retaliatory" but only in the literal, not legally actionable, sense. The fact that the label does not comfortably fit the prison environment is a further indication that courts should not imply a Bivens remedy to second guess the prison custodian.

The strongest argument in opposition to this reasoning, which plaintiff has not advanced, is that the federal courts are already involved in balancing free speech rights with prison security concerns when it comes to state prisoners and frequently entertain state prisoners' claims under 42 U.S.C. § 1983 for First Amendment retaliation. See e.g. Espinal v. Goord, 558 F.3d 119 (2d Cir. 2009). There is even Second Circuit authority upholding claims by state prisoners for transfers to other facilities allegedly in retaliation for the prisoners' exercise of First Amendment rights. See Davis v. Kelly, 160 F.3d 917, 920 (2d Cir. 1998), citing Hendrick v. Coughlin, 114 F.3d 390, 393-94 (2d Cir. 1997). Indeed, because the First Amendment, by its literal terms, constitutes a prohibition against federal, not state, infringement of First Amendment ("*Congress*

---

[3] Plaintiff's reliance on Zherka v. Ryan, ___ F. Supp. 3d ___, 2014 WL 4928956 (S.D.N.Y. Sept. 30, 2014) – the only case he identifies that has implied a Bivens claim in the First Amendment context – is therefore misplaced. It was a taxpayer action, not a prisoners' rights claim.

shall make no law …") (emphasis added), and has been held to apply to the States only by implied incorporation under the Fourteenth Amendment, see Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625 (1925), it could be argued that there is an anomaly in allowing state prisoners to bring these claims but not federal prisoners.

However, as Malesko expressly recognized, 534 U.S. at 71 n.5, 122 S.Ct. 522 n.5, any anomaly reflects a deliberate choice of Congress. In passing the Civil Rights Act of 1871, 42 U.S.C. § 1983, Congress specifically sought to create a legislative mechanism by which citizens could enforce their constitutional rights against their own state governments. It has not taken similar action with regard to enforcement of constitutional rights against the federal government. To the contrary, with relatively narrow exceptions, it has zealously guarded the Government's prerogative as sovereign not to be sued. And since the end of the "heady days," Malesko, 534 U.S. at 75, 122 S.Ct. at 524 (Scalia, J., concurring), when the Supreme Court assumed the co-equal power to create causes of action to enforce constitutional rights, it remains up to Congress to alter the remedial mechanisms, not the courts.

Congress, in fact, has been active in the area of prisoners' rights and its actions do not point to their enhancement. Subsequent to Bivens and its two permissive progeny, Congress has taken action to limit, not expand, the number of prisoners' rights suits that are filed in federal courts. The Prisoners' Litigation Reform Act, 42 U.S.C. § 1997e(a) *et seq.*, codifies the requirement of administrative exhaustion in §2241 habeas corpus cases and applies it to prisoners' rights actions. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002). "The purpose of the PLRA is to reduce the quantity and improve the quality of

prisoner suits and to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011) (alterations and internal quotation marks omitted). Even in those few areas where Bivens relief is available, it is established that federal prisoners must comply with the PLRA before seeking relief in federal court. See Porter, 534 U.S. at 524, 122 S.Ct. at 988.

My point is not that plaintiff's claim should be dismissed for failure to exhaust. It is, rather, that Congress, fully aware of the limited scope of Bivens, has sought to further condition rather than expand the remedy. This consideration also weighs in favor of the courts not acting unilaterally to create new opportunities for increased litigation. I therefore decline plaintiff's request to extend Bivens into an area where no court has gone before.

## II

The common law as applied in New York, of course, recognizes a claim for false imprisonment, whether the tort is committed by a private person or a governmental or police agent. It is axiomatic, however, that no such claim will obtain if the plaintiff's confinement is "otherwise privileged." See, e.g., Broughton v. State, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93 (1975). Plaintiff contends that his reassignment to the MDC SHU was not "otherwise privileged" because BOP regulations did not allow it.

I reject this argument, for it skips a step in reasoning. Plaintiff's confinement was uncategorically privileged because he was a convicted felon serving his sentence. He was sentenced to seven years in the custody of the BOP for having committed a serious federal crime. His custody was the product of a judgment of conviction of a United States District Court that remanded him to the BOP. The judgment did not specify and could not have specified the type of facility in which he would be imprisoned. Upon its entry and until its satisfaction, plaintiff

could have no claim for false imprisonment because there was nothing false about it. And it goes without saying that plaintiff's alternative labeling of his claim as "false arrest" does not apply because he was already in custody and thus could not be arrested by the BOP, his custodian.

Running through plaintiff's argument is his apparent view that confinement to a halfway house, because of its less restrictive conditions, is not to be considered "custody," even though it is part of his court-imposed custodial term, and that, therefore, his reassignment from the halfway house to the MDC was a change from non-custody to custody. The complaint, for example, alleges that plaintiff was "released" from the MDC on August 5, 2013, although, in fact, he was simply reassigned to the halfway house. Similarly, plaintiff's brief argues that "there was no privilege to imprison" plaintiff, as if assignment to a halfway house is not imprisonment. He offers that "[t]he whole purpose a RRC is to allow the individual substantially greater rights and freedoms than they would be entitled to while a prisoner. . . . Any justification for restricting Mr. McGowan's rights must take into consideration that he was not an individual who had his liberty restricted to the degree of a prisoner."

I again reject plaintiff's basic assumption that he was more akin to a free man prior to his remand to the MDC and only became a prisoner upon remand. The halfway house is simply one of the facilities operated by the BOP. It is a different kind of imprisonment than maximum security, just as a supermax facility is different than a prison camp, but it is still imprisonment. The restrictions, although less than in some other facilities, remain onerous. Unauthorized departures or failure to return from authorized departures are chargeable as felony escape under federal law, see 18 U.S.C. § 751, and punishable by five years of additional imprisonment. The rules and conduct prohibitions for this particular halfway house, like all others I have seen, are extensive, governing virtually every facet of daily life, very similar to what one would expect to

find in a federal prison camp or minimum security facility.[4]  It is facetious for plaintiff to claim, as he effectively does, that everyone else in the prison system, whether assigned to a supermax, maximum, moderate, minimum, or camp facility, is incapable of being falsely imprisoned by a reassignment within those categories, but halfway house inmates have a special status which opens their reassignment to the tort of false imprisonment.

What plaintiff is actually complaining about is not the fact of his confinement – it is, rather, the type or conditions of his confinement.  But the common law, when considering the tort of false imprisonment, recognizes no such liability.  If a private or state actor is entitled to hold a prisoner, liability for false imprisonment never rises or falls based on the conditions under which he is held, just as a kidnapper who allows his victim to pick up groceries but threatens her should she not return is no less a kidnapper.  The inquiry ends, at least for purposes of the tort of false imprisonment, upon the finding that some form – any form – of confinement was legally permitted.  If the imprisonment is false and the conditions are oppressive, those onerous conditions may enhance the plaintiff's damage recovery, or even in the absence of a false imprisonment claim, unreasonable conditions of confinement may give rise to other common law claims such as battery.  But if the law recognizes the right to confine, there can be no tort of false imprisonment based on the conditions of confinement.

The Second Circuit's decision in <u>Liranzo v. U.S.</u>, 690 F.3d 78, 94 (2d Cir. 2012), illustrates this point. There, the Court held that illegal detention by the Immigration and Naturalization Service could be actionable under the FTCA as an analogue to a false imprisonment claim that challenges a "citizen's arrest," where a private citizen may be

---

[4] <u>See</u> *Brooklyn House Resident Handbook*, available at
http://nyepnt.nyep.circ2.dcn/specialist/reentry/Residential%20Reentry%20Center/Brooklyn%20House%20Resident%20Hanbdook.pdf (last visited March 22, 2015).

authorized to detain a suspected criminal but may be sued if turns out that there was no basis to detain the suspect.  But if one citizen legitimately arrests a suspected perpetrator, it does not matter whether the detainee is kept in the citizen's living room or his garage.  And if the arrest is privileged, then it does not become false if the citizen chose the garage.  Liranzo reflects a change in custody status from unrestricted freedom to custody, and therefore fits well within the common law tort of false imprisonment.  That is not akin to the change in conditions of confinement about which plaintiff is complaining here.

Finally, I note that the discussion above, holding that plaintiff has failed to state a claim for false imprisonment, presents a subtly different deficiency than the Government raised in its motion to dismiss.  Rather than expressly referring to the legal deficiency of the claim, the Government asserts that I lack subject matter jurisdiction to hear it because there is no "private analogue" to the claim under the common law.  It is of course fundamental under the Federal Torts Claims Act that for liability to exist, there must be a private state law analogue that imposes liability in "like circumstances."  See Liranzo, 690 F.3d at 84.  The "plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred."  Akutowicz v. United States, 859 F.2d 1122, 1125 (2d Cir. 1988) (internal quotation marks omitted).  However, "[t]he FTCA does not extend to conduct governed exclusively by federal law, or to conduct of a governmental nature or function that has no analogous liability in the law of torts."  Id. (internal citations and quotation marks omitted).

This is one of those areas where there is a nearly complete overlap between a deficiency in subject matter jurisdiction and a deficiency in the merits of the claim itself.  In essence, the Government's argument is that there is no subject matter jurisdiction because there is no valid claim under the common law.  It points out that although the FTCA expressly authorizes claims

for false imprisonment, see 28 U.S.C. § 2680(h), that authorization is narrowed as it is for all torts by the overarching requirement of the FTCA that there must be a private analogue for any claim brought under the FTCA, whether expressly referenced in the statute or not. It correctly cites to Saleh v. United States, No. 12-civ-4598, 2013 WL 5439140, at *9 (S.D.N.Y. Sept. 30, 2013), which so held, and I think that reasoning is correct. But I see no reason to further engage in the academic exercise of determining whether there are one rather than two grounds upon which plaintiff's false imprisonment claim fails, since it is clear that it fails on at least one.

### III

The parties treat plaintiff's claims for false imprisonment and negligence interchangeably, as if the disposition of one controls the disposition of the other. There is some logic in that, as the Government's arguments as to each are similar. The Government asserts that there is no "private analogue" for the negligent assignment of an inmate to the "wrong" facility because only a governmental entity can assign a prisoner to a facility. Applying the elements of a negligence claim, plaintiff counters that the BOP had a "duty to follow its own regulations. The Government did not follow its regulations. Mr. McGowan was injured when the Government did not follow its regulations." Thus, argues plaintiff, the Government was negligent.

There are certainly some actions that the BOP can take for which it will be liable for negligence under the FTCA. The common law action for negligence is far broader than false imprisonment, as its elements are more general, the situations in which the law will deem a duty to arise have no fixed limitations, and the scope of the duty, if it is found to exist, can be entirely dependent on the circumstances of each case.

The Second Circuit has repeatedly found the BOP at least potentially subject to negligence claims as a result of conduct by its employees that is contemplated by prison regulations. In <u>Coulthurst v. United States</u>, 214 F.3d 106, 108 (2d Cir. 2000), for example, the prison manual required the facility to "visit the inmate wellness area [*i.e.*, exercise facility] . . . and determine if the equipment is arranged in a safe manner and if participants use the equipment properly." The plaintiff-inmate was injured while using the equipment, and sued in negligence for failing to conduct sufficient inspections and failing to replace the worn parts after undue wear and tear. The Second Circuit held that to the extent plaintiff was suing for an inadequately designed inspection policy and practice, his claim would be barred by the FTCA's discretionary function exception, <u>see</u> 28 U.S.C. § 2690(a), but if the proof showed that, for example, a guard was too lazy to change the worn parts, that was not a matter of discretion and there could be liability.

Similarly, in <u>Triestman v. Federal Bureau of Prisons</u>, 470 F.3d 471, 472 (2d Cir. 2006), the BOP had a written policy requiring an emergency "call button" in any area of a prison that did not have "continuous staff coverage." The plaintiff *pro se* contended that he was sexually assaulted as a result of the failure to adhere to this policy. On these sympathetic facts, the Second Circuit stretched mightily to liberally read the complaint as containing not only the plaintiff's theory that it was a negligent policy decision to not have adequate patrols or call buttons, but the Circuit also implied a claim, despite the absence of allegations, that the officer on duty failed to patrol or respond diligently. The Court suggested, although it did not hold, that the former theory might be barred by the discretionary function exception; it did hold, however, that the latter theory would not be.

To some extent, plaintiff's negligence theory appears similar to the claim that was explicitly allowed in <u>Triestman</u>. Plaintiff is not complaining about the design of a defective policy as to when an inmate is or is not allowed to publish under a byline. He is alleging, rather, that a particular prison official, Rivers, made a mistake in the implementation of what was, at the time, a valid policy. (I am construing the complaint to allege that Rivers was mistaken with respect to the FTCA claim, but also an alternative theory of intentional or reckless misconduct for purposes of the <u>Bivens</u> claim.)

In the instant case, plaintiff could not have been clearer both in his complaint and in opposing defendant's motion that his negligence claim rests entirely on what he perceives to be Rivers' failure to follow BOP regulations. The duty of care that he alleges was breached was the "duty to follow its own regulations." The breach of the duty is that "[t]he Government did not follow its regulations." He characterizes the regulation as follows: "28 U.S.C. § 540.20 specifically directs BOP staff *not* to discipline inmates for publishing under a byline" (emphasis in original). Rivers is therefore negligent, and the BOP is liable, for not following the regulation, according to plaintiff.

By relying so completely on the violation of the regulation as the sole basis for the existence of a duty and its breach, plaintiff has run squarely into the bar of sovereign immunity. A breach of government regulations cannot be the *sine qua non* of a negligence claim under the FTCA because there is no private analogue – private individuals have no regulations.

The Government properly relies on <u>Chen v. United States</u>, 854 F.2d 622 (2d Cir. 1988). There, the plaintiff corporation lost a federal contract when it is was debarred from an award on an interim basis. The Board of Contract Appeals ultimately reversed the debarment, but not in time to restore the contract award. The plaintiff sued under the FTCA for negligence, claiming

that the agency's regulations did not provide for interim debarment, and that the negligence of the contract agent in misapplying the regulations had cost it the contract. The Second Circuit affirmed dismissal of the claim because of, among other reasons, the lack of a private analogue, holding: "Clearly, violation of the government's duties under federal procurement regulations 'is action of the type that private persons could not engage in and hence could not be liable for under local law,'" id. at 626 (quoting Jayvee Brand v. United States, 721 F.2d 385, 390 (D.C. Cir. 1983)); cf. Klopp v. United States, 131 F.3d 131 (2d Cir. 1997) (table) (errors in filing by court clerks could not constitute negligence under the FTCA since there is no private analogue to court clerks' duties).

Based on plaintiff's presentation of his claim, I cannot materially distinguish this case from Chen. The only difference is that the Second Circuit described the alleged tort in Chen as negligence "*per se*," and plaintiff here has not used those words. But his theory of negligence is exactly that – Rivers misapplied a regulation and it is the misapplication itself that constitutes negligence. That regulation only applies to prison administrators regulating and reacting to the conduct of prisoners. There is no private analogue for it, and there is therefore no subject matter jurisdiction over plaintiff's negligence claim.

## IV

Having found that plaintiff's claims against the United States and Rivers fail, the question remains as to whether the Court should rule on the remaining common-law claims against CFS pursuant to its motion to dismiss. Under 28 U.S.C. § 1367(c)(3), when a court dismisses all claims over which it had original jurisdiction, then it may decline to hear those claims that fall only within it supplemental jurisdiction. I am inclined to exercise discretion in favor of dismissing the claims against CFS without prejudice, as that is the preferred practice when the

case is at an early stage, as it is here.  See <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139 (1966).  However, because the parties have not addressed this issue, plaintiff and CFS may submit a memorandum within 14 days of entry of this order on the docket setting forth any reasons why they believe the claims against CFS should not be dismissed without prejudice.

## CONCLUSION

The motion to dismiss of the United States and Rivers is granted.  Disposition of the motion to dismiss of CFS is deferred pending further submissions or expiration of the time to make them as set forth above.

**SO ORDERED.**


_____
                                                          U.S.D.J.

Dated: Brooklyn, New York
          March 23, 2015